**Melba V. GROVES, Administratrix of the Estate of Robert Groves, Deceased, Plaintiff,**

v.

**UNIVERSE TANKSHIPS, INC., Defendant.**

No. 64 Civ. 2005.

United States District Court
S. D. New York.

Jan. 20, 1970.

Paul C. Matthews, Jr., New York City, for plaintiff.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for defendant; Robert S. Blanc, Jr., New York City, of counsel.

OPINION

FREDERICK VAN PELT BRYAN, District Judge.

Defendant Universe Tankships, Inc. (Universe) moves pursuant to 12(b) F.

R.Civ.P. to dismiss the complaint for failure to state a claim upon which relief can be granted. Since the papers submitted on the motion present facts which are not alleged in the complaint, the motion will be treated as one for summary judgment under Rule 56.

Plaintiff is the administratrix of a deceased seaman who met his death, aboard the S. S. Ore Saturn owned by Universe, on November 5, 1962. The complaint alleges that death was caused by the negligence of Universe and the unseaworthiness of the vessel. Liability is asserted under the Jones Act, 46 U.S.C. § 688, and general maritime law.

The only question presented by the motion is the recurrent and troublesome one of the extent to which the Jones Act applies to foreign seamen injured or killed aboard foreign flag vessels.[1]

For all practical purposes the facts are undisputed. The Ore Saturn was a vessel of Liberian registry, flying the Liberian flag. Defendant Universe, her owner, is a Liberian corporation. Universe is wholly owned by Oceanic Tankships, Inc. (Oceanic), a Panamanian corporation, the stock of which is owned almost entirely by D. K. Ludwig, with the remaining shares held by W. W. Wagner. Both Ludwig and Wagner are American citizens and residents.

Ludwig also owns substantially all of the stock of and controls National Bulk Carriers, Inc. (National Bulk), a diversified shipping corporation organized under the laws of Delaware and having its principal offices and business and operating headquarters in New York City. Ludwig is president and a director of National Bulk. While National Bulk owns only a small number of ships directly, it has some 130 affiliated companies through which it conducts its operations. Universe is one of these affiliates and occupies the same office in New York as National Bulk. The principal officers of National Bulk and Universe are the same and are American citizens and residents. The business and shipping operations of Universe are directed by Ludwig through National Bulk from the joint New York offices. All claims by or against Universe are handled by the Claim Department of National Bulk.

Universe has only a nominal office in Liberia. It has no employees and conducts no business there. Its only other office is that with National Bulk in New York. Oceanic, the immediate parent of Universe, similarly has only nominal offices in Panama, the country of its incorporation. It has no employees and conducts no business in that country. Its only other office is also with National Bulk in New York.

The Ore Saturn was a bulk ore carrier. Her master was an American citizen and resident. She had a crew of mixed nationalities, including Canadians, Greeks, Danes, Germans, British West Indians, Okinawians and an American. There were no Liberian crew members. The vessel has never visited a Liberian port. During the period from 1961 through 1963 she regularly called at the Port of Philadelphia approximately once a month discharging a cargo of some 40,000 tons of iron ore and has since called at that port frequently.

Decedent was a British subject and a resident of Grand Cayman, British West Indies, as is plaintiff administratrix. Neither the decedent nor his administratrix have ever resided in the United States. Decedent joined the Ore Saturn on November 16, 1961 by signing Liberian Articles in Port of Spain, Trinidad. The Articles described the vessel as bound for the Port of Philadelphia. They provided that claims for

---

1. Defendant Universe concedes that this Court has jurisdiction. The avowed purpose of its motion is to eliminate the Jones Act claim so that the remaining claim based on general maritime law can be transferred from the civil to the admiralty side of the court. Universe wishes to seek final disposition there on the ground that neither American nor Liberian nonstatutory maritime law provides a remedy for wrongful death.

injury and death should be governed by the laws of Liberia and that each crew member was required to join the Global Seamen's Union. Apparently, the Ore Saturn never unloaded or discharged cargo in Port of Spain.

As the Supreme Court pointed out in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), in determining whether the Jones Act applies to a foreign seaman injured aboard a foreign flag vessel, "we are simply dealing with a problem of statutory construction." (Id. at 578, 73 S.Ct. at 926) The Court indicated that the problem could be resolved "by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved" and "from weighing * * * the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority." Id. at 582, 73 S.Ct. at 928. The Court listed seven factors to be considered: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) the accessibility of a foreign forum; and (7) the law of the forum.

The facts in Lauritzen were as follows: Plaintiff, a Danish seaman, had joined the crew of a ship of Danish flag and registry, owned by a Danish citizen, while he was temporarily in New York. He had signed Ship's Articles written in Danish and providing that his rights as a crew member would be governed by Danish law and by the owner's contract with the Danish Seamen's Union of which he was a member. Plaintiff had been negligently injured in the course of his employment aboard the vessel while she was in harbor at Havana, Cuba. He brought suit under the Jones Act in the Southern District of New York.

After considering the seven relevant factors in so far as they applied to the facts before it, the Court readily concluded there was no justification for construing the Jones Act so as to apply to the plaintiff.

In discussing the relevant factors, the Court said: "Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag." Id. at 584, 73 S.Ct. at 929. "The law of the flag prevails unless some heavy counterweight appears."[2] Id. at 586, 73 S.Ct. at 930.

The place of the wrongful act was considered to be of little significance "because of the varieties of legal authority over waters [ships] may navigate." Id. at 583, 73 S.Ct. at 929. The place of contract, generally fortuitous, was not of "substantial influence in the choice between competing laws to govern a maritime tort." Id. at 589, 73 S.Ct. at 932.

On the facts before the Court, neither the accessibility of a forum nor the fact that an American forum had perfected jurisdiction over the parties were thought to be factors of significance. Moreover, since the nationality of the seaman, of the ship and of its owner coincided, neither the allegiance of the injured party nor the allegiance of the shipowner gave rise to any conflict and presented no problems.

However, in discussing the allegiance of the shipowner, the Court was careful to point out:

"* * * [I]t is common knowledge that in recent years a practice has

---

2. In McCulloch v. Sociedad Nacional, etc., 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), holding that the National Labor Relations Act did not apply to maritime operations of ships owned by foreign subsidiaries of American corporations, crewed by alien seamen, the Court rejected the balancing of contacts theory as a basis for determining jurisdiction under the National Labor Relations Act. However, it recognized that such procedure was proper in différent contexts such as the Jones Act and emphasized the "cardinal importance" of the law of the flag. 372 U.S. at 19, n. 9, 83 S.Ct. 671.

grown, particularly among American shipowners, to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries. Confronted with such operations, our courts on occasion have pressed beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places upon them." Id. at 587, 73 S.Ct. at 931.

It is plain that the pattern of facts on which Lauritzen determined that the Jones Act did not apply showed only a bare minimum of American connection. As Judge Medina said in Bartholomew v. Universe Tankships, Inc., 263 F.2d 437 (2d Cir. 1959) " * * * the discussion in Lauritzen does no more than establish the insubstantiality of the contacts present in that case." Id. at 443. However, where American connections are more substantial, and particularly where the reality of American ownership and control through the device of a flag of convenience appears, application of the Lauritzen criteria to determine whether or not the Jones Act applies is not without its difficulties. See, e. g., Bartholomew v. Universe Tankships, Inc., supra; Tjonaman v. A./S Glittre, 340 F.2d 290 (2d Cir. 1965); Tsakonites v. Transpacific Carriers Corp., 368 F.2d 426 (2d Cir. 1966); Voyiatzis v. National Shipping & Trading Corp., 199 F. Supp. 920 (S.D.N.Y.1961); Moutzouris v. National Shipping & Trading Co., 196 F.Supp. 482 (S.D.N.Y.1961).

Bartholomew v. Universe Tankships, Inc., supra, involved injury to a seaman aboard a Liberian flag vessel owned by the same Liberian corporate defendant as in the case at bar. The facts as to ownership, control and operation of defendant Universe and thus of the vessel by American citizens and residents were substantially the same as they are here, except that affiliation of Universe with National Bulk and the conduct of its operations through that corporation apparently were not shown. A principal question presented was whether the Jones Act applied.

After a comprehensive review of Lauritzen and the other cases decided up to that time, Judge Medina concluded that: " * * * in a particular case something between minimal and preponderant contacts is necessary if the Jones Act is to be applied. Thus we conclude that the test is that 'substantial' contacts are necessary." 263 F.2d at 440.

He went on to say:

"Some of the advantages of this simple formula are that it states a rational method of ascertaining the congressional intent, and that in its application there is no occasion to consider and 'weigh' the contacts that do not exist, nor to go through any process of balancing one set of facts that are present against another set of facts that are absent, without any sure guide as to how the balancing is to be done. Accordingly, the decisional process of arriving at a conclusion on the subject of the application of the Jones Act involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial. * * * Moreover, each factor, or contact, or group of facts must be tested in the light of the underlying objective, which is to effectuate the liberal purposes of the Jones Act. * * *"

In Bartholomew, plaintiff, a British West Indies citizen, had been brought to New York by Universe and had signed on as a seaman on one of its vessels in Baltimore. Since then plaintiff had lived in Brooklyn and had declared his intention of becoming an American citizen. Articles on the voyage, which began in Baltimore and ended in Philadelphia, were signed in Baltimore. The Articles contained no provision as to what law would govern in case of injury. The assault which caused the injury complained of occurred in American territorial waters.

On these facts Judge Medina found it "clear beyond peradventure of doubt" that "the factors or contacts * * * are in the aggregate substantial" and held that the Jones Act plainly applied. Id. at 442–443.

Just as the holding in Lauritzen established no more than the insubstantiality of the contacts present in that case, so the Bartholomew holding established no more than the very substantial contacts present there. Bartholomew by no means limited the applicability of the Jones Act to cases where American contacts were as profuse as they were in that case. Indeed, Judge Medina emphasized:

> "* * * the practice in this type of case of looking through the facade of foreign registration and incorporation to the American ownership behind it is now well established. [cases omitted] This is essential unless the purposes of the Jones Act are to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag. See Lauritzen, 345 U.S. at page 587, 73 S.Ct. at page 930. In the case now before us [defendant] has taken the trouble to insert an additional nominal foreign corporation between the flag and the true beneficial ownership of the vessel. But we have little difficulty in brushing all this aside when considering the applicability *vel non* of the Jones Act. Complicating the mechanics of evasive schemes cannot serve to make them more effective. What we now do is not to disregard the corporate entity to impose liability on the stockholders, but rather to consider a foreign corporation as if it were an American corporation pursuant to the liberal policies of a regulatory act." Id. at 442.

Judge Medina further said "Indeed, cases such as Mproumeriotis v. Seacrest Shipping Co., D.C.S.D.N.Y.1957, 149 F. Supp. 265, and Argyros v. Polar Compania De Navegacion, Ltda., D.C.S.D. N.Y.1956, 146 F.Supp. 624, holding American ownership alone insufficient to warrant application of the Jones Act must be considered of doubtful validity." Id. at 443, n. 9.

Thus, while Bartholomew, because of the profusion of American contacts there did not have to go so far as to hold that American ownership and control through the flag of convenience device, standing by itself, requires the application of the Jones Act, the opinion indicates that the Court would so hold if faced with such a situation.

Subsequent cases in the Court of Appeals for this circuit holding on particular facts that American law did not apply to a foreign seaman injured aboard a foreign flag vessel detract in no way from the force of what was said in Bartholomew.

In Tjonaman v. A/S Glittre, 340 F.2d 290 (2d Cir. 1965), the owner of the Norwegian flag vessel on which the injury occurred was a Norwegian corporation which had a general agent here. The injured seaman, a Dutch citizen, had signed Norwegian Articles in the office of the Norwegian Consul in New York calling for the application of Norwegian law. He had been a permanent resident of the United States for only 29 days and had obtained his berth through the Norwegian Seamen's Union of which he was a member. He was injured in Ghanian waters. He sued under the general maritime law. In holding that the general maritime law of the United States did not apply, the Court said (p. 291):

> "The present case is readily distinguishable from the 'flag of convenience' cases where the foreign registration is only nominal and the vessel belongs to the nation of the flag it flies only for the purpose of avoiding the shipping laws of the United States." [cases omitted]

In Tsakonites v. Transpacific Carriers Corp., 368 F.2d 426 (2d Cir. 1966), the

seaman was a Greek citizen and resident aboard a Greek vessel, who had signed Articles in Piraeus, Greece, providing that claims were to be tried in the Greek courts. The vessel was owned by a Panamanian corporation, in turn wholly owned by a Greek corporation, 96% of the stock of which was owned by a Greek citizen who had been for some years a permanent resident of the United States. The Greek corporation had an office in New York and also an active office in Piraeus. The injury occurred in an American port. On these facts, Judge Moore, writing for the majority, held that the Jones Act did not apply. But he was careful to point out that the Greek flag could not "be said to be a 'flag of convenience' within the meaning" of Bartholomew and similar cases, 368 F.2d at 428.

In a strong dissent, Judge Waterman was of the view that since 96% of the stock of the Greek corporation which owned the vessel through its Panamanian subsidiary was held by a permanent resident of the United States, the Jones Act did apply.[3]

The case at bar is a classic "flag of convenience" case.

The ultimate owners of the Liberian flag Ore Saturn and of her nominal Liberian corporate owner Universe were all American citizens and residents. The Ore Saturn and Universe were controlled and directed by the American owners through the National Bulk shipping complex, wholly owned and controlled by them from the New York principal offices of both corporations. The nominal Liberian incorporation of Universe with nothing but a formal office address in Liberia, sans employees and business, and the insertion of the similarly nominal Panamanian corporation Oceanic between Universe and its real American

owners appear to be only for the purpose of creating a facade to avoid the consequences of American ownership and evade stringent American shipping laws. No other purpose has been shown.

The Liberian registration and flag of the Ore Saturn were part of the same facade. The vessel has never been in a Liberian port and it is not likely that she ever will be. During the period decedent served aboard her, she was engaged in regular runs to Philadelphia. Her master was an American citizen and resident. None of her crew of mixed nationalities were Liberian. The decedent West Indian seaman had no connections whatever with Liberia and his allegiance and domicile are thus of little, if any, significance here. There is no legitimate national interest of Liberia to be served by the assertion of Liberian authority over the vessel and her crew other than the bare fact of registry. There is no logical nexus between the vessel and her Liberian flag and registry.

█ Other factors present here are of little significance. As Lauritzen pointed out, neither the place of contract nor the place of the wrongful act are to be given any substantial weight. Thus, the fact that the place of the wrongful act was in Japan cannot be considered as a factor in favor of upholding the law of the flag here. Nor can the fortuitous fact that the Articles were signed by the West Indian decedent in Trinidad while the vessel was en route to Philadelphia. In any case, in view of the substantiality of the American contacts, these factors are irrelevant.

The fact that the Articles signed were Liberian and provided that the rights of the seaman were to be governed by the laws of Liberia does not bolster to any substantial degree the claim that this was a legitimate Liberian operation.

---

3. It may be noted that the Court of Appeals for the 5th Circuit recently adopted Judge Waterman's view in Hellenic Lines Ltd. v. Rhoditis, 412 F.2d 919 (5th Cir. 1969), cert. granted, 90 S.Ct. 554 (Jan. 13, 1970) (No. 661). The same Greek corporation as in Tsakonites was the defendant and the facts were substantially the same. The Fifth Circuit held that the Jones Act applied in such a case.

This appears to be merely one of the mechanics of the over-all scheme to evade the consequences of American ownership. The Liberian forum was inaccessible to one in the decedent's position. It is certainly not by chance that the owners of the Ore Saturn chose a flag of convenience of a country whose maritime law is confined to the non-statutory maritime law of the United States and thus excludes Jones Act liability. On the other hand, there is nothing illogical about applying the American law of the forum to ships owned, operated and controlled by American citizens and residents from their headquarters in the United States.

■ Thus, Liberian registration and incorporation are a facade to disguise American ownership, operation and control and merely mechanics in a scheme designed to avoid the consequences of such ownership and evade American shipping laws. The Court must look through that facade to the realities. It is clear that American ownership and American operation and control exercised by such owners from offices in the United States constitute substantial contacts with this country. The substantial contacts with the United States through American ownership, control and operation from the United States provide the "heavy counterweight" necessary to overcome the law of the flag which in this case is purely a flag of convenience in the barest sense. Lauritzen v. Larsen, supra, 345 U.S. at 586, 73 S.Ct. 921.

The Jones Act must therefore be construed to apply and I so hold. Such a holding is dictated not only by the language of Lauritzen, Bartholomew and the cases subsequently decided, but by sound policy and common sense. It is essential, unless the liberal policies and purposes of the Jones Act are "to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag". Bartholomew v. Universe Tankships, Inc., supra, 263 F.2d at 442.

The motion of defendant is therefore in all respects denied.

It is so ordered.

